**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 93-4935
_____

UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

versus

BRUCE R. WEST, SR.,

                              Defendant-Appellant.

_____

Appeals from the United States District Court
for the Eastern District of Texas
_____
(May 31, 1994)

Before WISDOM, BARKSDALE, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Defendant Bruce West, Sr. was tried before a jury and convicted of ten counts of bankruptcy fraud, in violation of 18 U.S.C. § 152 (1988), eleven counts of money laundering, in violation of 18 U.S.C. § 1956, and one count of conspiring to commit bankruptcy fraud, in violation of 18 U.S.C. § 371.  West now appeals his conviction, contending both that the indictment did not properly charge violations of the bankruptcy fraud and money laundering statutes and that the district court's admission of and refusal to admit certain evidence deprived him of a fair trial.  We affirm.

Bruce West, Sr., a Texas real estate developer, experienced serious financial problems as a result of the decline in the Texas economy during the mid- to late 1980s.  West eventually filed a petition in bankruptcy on April 2, 1990.  This criminal case emanates from West's bankruptcy filing, with many of the charges contained in the indictment based on three transactions that West participated in shortly before filing his bankruptcy petition.

**A**

In April 1989, West sold his homestead ("Dondi Farms") to Earlene Jett, as trustee for her son, Scott Mays.  West received $75,000 in cash and a note signed by Jett in the amount of $277,500 ("the Jett note").  As part of the transaction, West leased, and held an option to purchase, a lakehouse owned by Jett.  The Jett note was payable in quarterly installments of $8900;  under the terms of the sale contract, however, West allowed Jett to deduct from the note payments the monies due Jett as a result of the lakehouse lease.  West received ten payments on the Jett note, all of which are the basis of money laundering charges.[1]

---

[1]     Jett wrote checks for three payments that were payable to West;  West deposited these checks into an account held by Exalter, Inc. ("Exalter"), a Texas corporation formed by West and owned by West's three children.  West deposited a fourth check into an account held by Sandra Malmay, his then-girlfriend;  Malmay subsequently transferred the proceeds of that check into Exalter's account.  West also deposited three checks, made

In June 1990, West arranged for a third party to purchase Jett's lakehouse for an amount slightly exceeding its existing mortgage. After the sale had closed, Jett paid the excess))$2,613))to West, who subsequently gave the money to Betty Ruben and Jo Ann Johnson as compensation for finding the buyer. Jett also received a refund on her insurance escrow account, which she paid to West and he then paid to Johnson. West's involvement with the sale of the lakehouse and its proceeds forms the basis for a single count of bankruptcy fraud.

**B**

The second transaction at issue involved the 1989 purchase of two notes executed by West and held by the Federal Deposit Insurance Corporation ("FDIC"). In 1984, West purchased a building in Addison, Texas ("the Broadway building") for $650,000, financing $350,000 of the purchase price with a loan from Parkway Bank & Trust ("Parkway"). A deed of trust for the building secured West's promissory note. In 1988, Parkway failed, the FDIC was appointed as receiver, and West defaulted on the loan.[2] The FDIC, through bank liquidation specialist Lawrence Greer, began negotiating with West to work out or liquidate the loans for the sum of $150,000. West informed Greer

_____

payable to Exalter, directly into Exalter's account. West deposited the final three checks, which were made payable to him, into Malmay's account; the proceeds from these checks apparently were not transferred to Exalter's account.

[2]     West also defaulted on a second loan secured by three relatively worthless over-the-counter stocks.

that although he did not have the funds to make payment on the Parkway notes, he had "arranged for and [had] an agreement from a company to make it possible to purchase the notes for $150,000." After receiving assurances from West that the transaction between West and North Star Funding ("North Star")))the corporation that had agreed to purchase the Parkway notes))occurred at "arms-length," the FDIC agreed to sell the notes to North Star. Unbeknownst to the FDIC, however, North Star had agreed to act as a nominee, or "straw," purchaser on West's behalf.[3]  Thus, West supplied the $150,000 needed to purchase the notes and later arranged for North Star to foreclose on the notes and sell the Broadway building to Exalter, his children's corporation.[4]

C

The third transaction at issue involves Exalter's purchase and subsequent sale to West of a house in Frisco, Texas ("the Frisco house").  In June 1989, Richard McCally sold the Frisco house and an adjacent vacant lot to Exalter in exchange for

[3]	Although West's brief on appeal suggested that he was not challenging any of the factual findings made by the jury, West does argue that the FDIC knew of and encouraged his use of a straw purchaser.  Indeed, at oral argument West's counsel asserted that two FDIC witnesses))Greer and Walter Keller, who dealt with West after Greer left the agency))committed perjury by denying they knew that West was the actual purchaser of the notes.

[4]	West obtained the $150,000 when Jack Franks))a West business associate))repaid a loan made by West, which was secured by a lien on real estate that Franks owned.  West previously had reported to the FDIC that the value of his lien was "materially affect[ed]" because prior, senior liens on the real estate were "in default and posted for foreclosure."

-4-

$125,000 in cash and the Broadway Building, which McCally valued at $545,000.[5]  West subsequently purchased the Frisco house, and used it as his homestead, from Exalter for $622,500, which included $312,524 in cash, a personal note in the amount of $277,500, which was secured by the Jett note, and a promissory note in the amount of $32,746, which was secured by a first lien deed of trust on the property.  The cash portion of the purchase price consisted of "loans" previously made by West to Exalter. West's transfer of a security interest in the Jett note to Exalter forms the basis of a single bankruptcy fraud count.

**D**

West's failure to report his interest in two bank accounts forms the basis for two additional counts of bankruptcy fraud)) Counts 24(a) and 26.  In April 1989, Jack Franks wired $219,930 to Commonwealth National Bank in West's name.  Because West did not have an account at Commonwealth, a bank employee opened an account in West's name into which the funds could be deposited. In May, West ordered the bank to close the account and disburse the funds as follows:  a $150,000 cashier's check payable to the FDIC listing North Star Funding as the remittitur, which West subsequently presented to the FDIC in exchange for the Parkway

---

[5]     McCally testified that, until the date of closing, he believed West to be the purchaser.  West concedes that he conducted the negotiations resulting in Exalter's purchase of the Frisco house.

notes; $50,000 deposited into a new account in Exalter's name;[6] and the balance of $19,930 in cashier's checks payable to West.

Count 26 charged West with fraudulently transferring and concealing funds in a second Commonwealth account, which was opened by Sandra Malmay, West's then-girlfriend, in September 1989. Malmay testified that West directed her to open the account in her name because he was afraid that any accounts held in his name would be garnished. Malmay further stated that checks drawn on the account "mostly" benefitted West and were paid with funds deposited by West. Moreover, West deposited several payments made pursuant to the Jett note into the account, the proceeds of which then were transferred to Exalter.

Count 31 charged West with money laundering. The transactions underlying this count involved two automobiles))a 1962 Mazda coupe and a 1935 Austin. West failed to list the Mazda on the appropriate bankruptcy schedules and erroneously indicated that he held only a one-half interest in the Austin. However, West subsequently conveyed the cars to Great Cars, Inc. ("Great Cars") in exchange for a dune buggy and $5,750 cash, which was deposited into the Malmay account.

---

[6] This deposit forms the basis for one count of bankruptcy fraud))Count 7.

II

West was convicted of several counts of bankruptcy fraud, in violation of 18 U.S.C. § 152.[7]  Three of these counts charged West with fraudulently transferring funds to Exalter during February and March 1989.  West contends that transfers, which occurred more than one year prior to the filing of his bankruptcy petition, cannot provide the basis for a § 152 prosecution because the transfers were "outside the jurisdiction of the Bankruptcy Code."  As support for his construction of § 152, West points to 11 U.S.C. § 548(a), which allows a bankruptcy trustee "to avoid any transfer of an interest of the debtor in property . . . that was made . . . on or within one year before the date of the filing of the petition."  West submits that because the trustee lacked jurisdiction over the transferred funds, the government may not prosecute him for bankruptcy fraud.[8]

We disagree with West's interpretation of § 152.  The plain language of § 152 certainly cannot be read to impose the

---

[7]     The relevant portion of this statute provides that "[w]hoever . . . in contemplation of a case under title 11 by or against him . . . , or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property" shall be guilty of bankruptcy fraud.  18 U.S.C. § 152 ¶ 7.

[8]     With regard to this argument, West does not challenge the sufficiency of the evidence as to the *mens rea* requirements found in paragraph 7 of § 152)) i.e., whether he transferred or concealed property (1) knowingly, (2) fraudulently, and (3) in contemplation of a case under title 11 or with intent to defeat the provisions of title 11.  Instead, West argues only that the government is precluded from prosecuting him for transfers occurring more than one year prior to the date he filed his bankruptcy petition.

requirement suggested by West. *See United States v. Moody*, 923 F.2d 341, 347 (5th Cir. 1991) (noting that "words in a statute are to be given their plain and ordinary meaning"). Moreover, in light of the explicit intent requirements found in § 152, we will not transplant from the Bankruptcy Code the additional requirement that a fraudulent transfer, to be prosecutable as bankruptcy fraud, must be made within one year prior to the defendant's filing of his bankruptcy petition. A defendant may knowingly and fraudulently transfer property in contemplation of or with the intent to defeat the provisions of Title 11 without necessarily transferring the property within one year before filing a bankruptcy petition. *Cf.* Ralph C. McCullough, II, *Bankruptcy Fraud: Crime Without Punishment*, 96 Com. L. J. 257, 268 (1991) ("Theoretically, bankruptcy fraud could occur in contemplation of an apparently inevitable bankruptcy which the debtor later managed to escape."). Indeed, a knowledgeable defendant bent on pursuing a fraudulent course of action would effect a fraudulent transfer outside the one year period within which the bankruptcy trustee could rescind it. *See United States v. Dandy*, 998 F.2d 1344, 1348 (6th Cir. 1993) (defendant convicted of bankruptcy fraud when he exercised power over the bankrupt corporation "for exactly one year and one day in order to prevent [the bankrupt] from declaring bankruptcy during the one-year period within which [the defendant's diversion of assets] could be rescinded as an avoidable transfer under

bankruptcy law"); *Stegeman v. United States*, 425 F.2d 984, 986 (9th Cir. 1970) (§ 152 "`attempts to cover *all the possible methods* by which a bankrupt . . . may attempt to defeat the Bankruptcy Act through an effort to keep assets from being equitably distributed among creditors.'") (citation omitted). Consequently, we hold that the government may prosecute individuals under 18 U.S.C. § 152 for transfers of property occurring more than one year prior to the filing of a petition in bankruptcy if such transfers are made knowingly, fraudulently, and in contemplation of a case under title 11 or with intent to defeat the provisions of title 11.[9] *Cf. United States v. Grant*, 971 F.2d 799, 805 (1st Cir. 1992) (refusing to apply the "relation back" doctrine developed under the Bankruptcy Act in a criminal bankruptcy fraud case because the doctrine was not "designed to insulate bankruptcy fraud, either in the bankruptcy proceeding itself or in any related criminal proceeding").[10]

---

[9]    Notwithstanding West's contentions to the contrary, that fraudulent transfers are made in contemplation of title 11 or with the intent to defeat the provisions of title 11))a question that must be resolved by the jury))provides federal courts with jurisdiction.

[10]    West alludes to, but does not directly assert, the argument that his discharge in bankruptcy, entered in a bankruptcy proceeding to which an agency of the United States was a claimant, precluded a criminal prosecution for bankruptcy fraud.  To the extent West does assert this argument, however, we reject it.  *See United States v. Tatum*, 943 F.2d 370, 382 (4th Cir. 1991) (holding that a discharge in bankruptcy does not preclude a subsequent criminal prosecution for bankruptcy fraud).

West next challenges the sufficiency of Counts IX through XVIII and Count XXXI of the indictment, arguing that the government failed to adequately allege the elements of the charged offenses)) money laundering, in violation of 18 U.S.C. § 1956.[11]  "Whether an indictment sufficiently alleges the elements of an offense is a question of law to be reviewed de novo." *United States v. Shelton*, 937 F.2d 140, 142 (5th Cir.), *cert. denied*, ___ U.S. ___, 112 S. Ct. 607, 116 L. Ed. 2d 630 (1991). To obtain a conviction for money laundering, the government must prove "[t]hat the defendant 1) conducted or attempted to conduct a financial transaction, 2) which the defendant knew involved the proceeds of unlawful activity, 3) with the intent [either] to promote or further unlawful activity" or to conceal or disguise the nature, location, source, ownership, or control of the proceeds of unlawful activity.  *United States v. Ramirez*, 954

---

[11]    West's reply brief characterizes his argument as a challenge to the sufficiency of the evidence or as a claim of "plain error" under Fed. R. Crim. P. 52(b).  We, however, believe that West's argument properly should be viewed as a challenge to the sufficiency of the indictment. *See United States v. Cavalier*, 17 F.3d 90, 92 (5th Cir. 1994) (rejecting a similar argument made as a challenge to the sufficiency of the indictment); *United States v. Johnson*, 971 F.2d 562, 567 (10th Cir. 1992) ("Although appellant's argument is characterized as a challenge to the sufficiency of the evidence, it raises a question concerning the proper scope of § 1957 and it requires us to interpret the language of the statute.");  *United States v. Jackson*, 935 F.2d 832, 839-40 (7th Cir. 1991) (noting that although the defendant styled a similar argument "in terms of the sufficiency of the evidence, we believe that it involves a preliminary question of statutory construction.").

F.2d 1035, 1049 (5th Cir.), *cert. denied*, ___ U.S. ___, 112 S.
Ct. 3010, 120 L. Ed. 2d 884 (1992);  *see* 18 U.S.C.
§ 1956(a)(1)(A)(i) & (B)(i).  The government submits that West
violated the money laundering statute by accepting and depositing
payments received pursuant to the Jett note and his sale of the
two automobiles to Great Cars, Inc., acts that constitute
bankruptcy fraud.[12]

West contends that the crime of money laundering "must
always have at its core [the] act of taking `dirty money' and
making it `clean.'"  In contrast, West submits that "[t]he act at
the core of this case . . . was the taking of `clean money' and
making it dirty.'"  In other words, West contends the monies he
received from Jett and Great Cars were not proceeds of some
unlawful activity, but instead constituted the proceeds of lawful
activities))namely, Jett's purchase of Dondi Farms and Great
Cars' purchase of the two automobiles.  We disagree.  The mere
fact that Jett and Great Cars were innocent third parties))i.e.,
they did not conspire with West to commit bankruptcy fraud))does
not preclude West's conviction for money laundering.  Instead,
the checks that Jett and Great Cars gave to West involved the
proceeds of unlawful activity))West's attempts to fraudulently
conceal assets, in contemplation of a case under title 11 or with
intent to defeat the provisions of title 11.  Had West not

---

[12]    Bankruptcy fraud is a specified unlawful act under the
money laundering statute.  *See* 18 U.S.C. § 1956(c)(7)(D).

-12-

undertaken such a course of action, he would not have received any funds from Jett or Great Cars. Consequently, the checks at issue resulted from West's concealment of assets and, therefore, constituted the proceeds of West's bankruptcy fraud.[13] *See Cavalier*, 17 F.3d at 92-93. Accordingly, we conclude that West was properly charged with and convicted of money laundering.[14]

## IV

West also challenges several evidentiary rulings made by the district court. We review the district court's determinations as to the admissibility of evidence using the abuse of discretion standard. *See United States v. McAfee*, 8 F.3d 1010, 1017 (5th Cir. 1993) (exclusion of evidence); *United States v. Loney*, 959 F.2d 1332, 1340 (5th Cir. 1992) (admission of evidence).

---

[13] In his reply brief, West alludes to the argument that because the bankruptcy fraud offenses underlying several of the money laundering counts were completed when West transferred the security interest in the Jett note to Exalter, subsequent deposits of payments made on the note could not constitute money laundering. However, we rejected this very view in *Cavalier*. *See* 17 F.3d at 93 ("According to Cavalier, one cannot promote a completed unlawful activity for the purposes of § 1956(a)(1)(A)(i). We disagree.") (footnote omitted); *see also United States v. Paramo*, 998 F.2d 1212, 1218 (3d Cir. 1993) (same), *cert. denied*, ___ U.S. ___, 114 S. Ct. 1076, ___ L. Ed. 2d ___ (1994).

[14] Our conclusion is supported by *United States v. Levine*, 970 F.2d 681, 686 (10th Cir. 1992). In *Levine*, the defendants engaged in a scheme to hide the existence of four tax refund checks to which their creditors or the bankruptcy estate was entitled. The court held that the refund checks, which were issued by innocent third parties))the Federal government and the state of Colorado)) "came from an unlawful source as they emanated from a bankruptcy fraud." *Id*. Consequently, the court upheld the defendants' money laundering convictions.

**A**

West first contends that the district court erred in refusing to allow him to introduce evidence that "it was a routine practice of the FDIC to sell notes held by a failed institution at a discount, and that the FDIC frequently allowed parties to purchase their own discounted note through third parties who were . . . `straw purchasers.'" West argues that such evidence was both relevant to the issue whether the FDIC knew that West was using North Star as a straw purchaser in the Parkway notes transaction and admissible as a "routine practice" of the FDIC.[15]

Rule 406 provides that "[e]vidence of the habit of a person or of the routine practice of an organization . . . is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice."[16] Fed. R. Evid. 406. Although "[t]here is no precise

---

[15] West has not alleged that he established, by proffer or otherwise, that non-FDIC employees Jack Franks, Doug Pennington, Nathan Reeder, or Philip Palmer ever had dealings with the FDIC during which they became familiar with the FDIC's routine practices. *See* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); Fed. R. Evid. 701 (limiting lay witnesses to giving opinions based upon first-hand knowledge or observation). Consequently, the district court did not abuse its discretion in excluding testimony from those individuals regarding the FDIC's routine practices.

[16] "Rule 406, on its face, applies in only two instances: (1) to show that an individual acted in conformity with his or her habit, and (2) to show that an organization acted in conformity with its routine practice." *United States v. Rangel-Arreola*, 991 F.2d 1519, 1523 (10th Cir. 1993). Here, the first application is not relevant as the proffered evidence involves

-14-

formula for determining when a practice becomes so consistent as to rise to the level of routine," "adequacy of sampling and uniformity of response are controlling considerations." *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1533 (11th Cir. 1985) (internal quotations omitted); *see also Reyes v. Missouri Pacific R.R.*, 589 F.2d 791, 795 (5th Cir. 1979).

After reviewing the record, we conclude that the evidence offered by West to prove the FDIC's routine practice, when considered in light of the FDIC's dealings with literally thousands of debtors during the mid- to late 1980s, "falls far short of the adequacy of sampling and uniformity of response which are the controlling considerations governing admissibility."[17] *G.M. Brod*, 759 F.2d at 1533. In fact, West has not attempted to make a comparison of the number of transactions in which the FDIC allegedly allowed straw purchasers with the number in which the FDIC did not. *See Simplex, Inc. v. Diversified Energy Sys., Inc.*,

---

neither Greer's nor Keller's habitual conduct. Thus, to utilize Rule 406, West must demonstrate that the excluded testimony would have related the routine practice of the FDIC.

[17] Additionally, to the extent West asserts that the district court erred in not allowing him to introduce evidence regarding the FDIC's *policies*, we disagree. Rule 406 is concerned not with an organization's policy, but with specific instances of conduct. Thus, Rule 406 does not require the district court to admit evidence pertaining to alleged policies followed by the FDIC. West does not argue that the policy evidence is admissible under some other rule, and we therefore do not reach this issue. See, however, 23 Charles A. Wright & Kenneth W. Graham, Federal Practice & Procedure § 5274, at 47 & n.35 (1980), where they distinguish evidence admissible under Rule 406 from evidence inadmissible under that Rule but admissible under another Rule, such as Rule 401.

847 F.2d 1290, 1294 (7th Cir. 1988) (noting the "the Rule 406 inquiry also necessitates some comparison of the number of instances in which any such conduct occurs with the number in which no such conduct took place") (internal quotation omitted). Finally, we note that both FDIC officials involved in the negotiations with West testified that they did not direct West to utilize a straw purchaser.[18] *See United States v. Newman*, 982 F.2d 665, 669 (1st Cir. 1992) ("[W]e are aware of no case, and the appellant cites none, in which the routine practice of an organization, without more, has been considered probative of the conduct of a particular individual within the organization."). Consequently, the district court did not abuse its discretion in finding Rule 406 inapplicable to the evidence presented by West.[19]

_____

[18]    West asserted at oral argument that the FDIC officials "lied."

[19]    Our conclusion is supported by the policies underlying Rule 406:

> The need for [routine practice] evidence rises out of
> the fact that in a large organization it is unlikely
> that any individual will remember one of a large number
> of repeated transactions, and even if he does, the cost
> of finding that person and producing him in court is
> disproportionate to the value of his testimony. . . .
> [T]he conduct to be defined as `routine practice' for
> purposes of Rule 406 should be of such a nature that it
> is unlikely that the individual instance can be
> recalled or the person who performed it can be located.

23 Wright & Graham, Federal Practice & Procedure § 5274, at 45-46.  Here, as previously noted, the FDIC officials with whom West dealt testified at trial that they did not direct West to utilize a straw purchaser.

**B**

West next contends that the district court erred in allowing the government to impeach Jack Franks, a prosecution witness, by means of Franks' prior convictions for mail fraud and two other felonies. Fed. R. Evid. 607 provides that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness."[20] However, the government may not introduce evidence of prior conviction "`under the guise of impeachment for the *primary* purpose of placing before the jury substantive evidence which is not otherwise admissible.'" *United States v. Hogan*, 763 F.2d 697, 702 (5th Cir. 1985) (quoting *United States v. Miller*, 664 F.2d 94, 97 (5th Cir. 1981), *cert. denied*, 459 U.S. 854, 103 S. Ct. 121, 74 L. Ed. 2d 106 (1982)). West argues that the government introduced evidence at trial regarding Franks' prior convictions for just such a prohibited purpose))namely, to prove West's guilt by his association with Franks.

West contends that the sole purpose behind Rule 607 is to allow the government to "pull the sting" of impeachment))i.e., to allow the government on direct examination to elicit the fact of conviction so as to prevent the defendant from exposing the conviction during cross-examination, thereby giving the jury the impression that the government was concealing a relevant fact about

---

[20]     Fed. R. Evid. 609 provides that the credibility of a witness other than the accused may be attacked using evidence that the witness has been convicted of a crime punishable by imprisonment in excess of one year.

its witness.  West submits that the government's intent to use Franks' convictions as substantive evidence of West's guilt is clear because West "guaranteed" that he would not impeach Franks using Franks' three prior felony convictions.  Over West's objections and in spite of West's "guarantee," however, the district court ruled that the government could introduce evidence of the prior convictions during direct examination.[21]

After reviewing the record, we conclude that the government's primary purpose in calling Franks was not to establish West's guilt by his association with Franks.  Indeed, West admits that Franks' testimony "played a critical role in several facets of the case."

---

[21] The government argued at trial that the fact of conviction was admissible because "[i]t is appropriate . . . for the jury to look at all factors which bear on a witness' credibility, and . . . prior felony convictions have a tendency and reason to affect the issue of credibility."  West argues that the government's reason for questioning Franks about his prior convictions is mere subterfuge.  We, however, have approved the very course of action taken by the government. *See United States v. Woolridge*, 572 F.2d 1027, 1029 (5th Cir. 1978) ("The Government's questioning of its own witness concerning prior felony convictions was admissible to enable the jury to evaluate the witness' testimony."); *see also United States v. Bileck*, 776 F.2d 195, 198 (7th Cir. 1985) ("The candor of the prosecutor in eliciting the fact that a witness has a felony conviction is to let the jury know precisely the kind of witness he is relying on. Such a technique is proper and often used."); *United States v. Bad Cob*, 560 F.2d 877, 883 (8th Cir. 1977) (noting that the introduction on direct examination of a witness's prior convictions "serves a twofold purpose:  (a) to bring out the witness' `real character,' the whole person, particularly his credibility, and (b) to draw the teeth out of the adversary's probable use of the same evidence on cross-examination"); *People v. Minsky*, 124 N.E. 126, 127 (N.Y. 1919) (noting that "when a disreputable witness is called and frankly presented to the jury as such, the party calling him represents him for the occasion and the purposes of the trial as worthy of belief").

Moreover, the government neither emphasized nor urged the jury to consider Franks' convictions as evidence of West's guilt. *Cf. United States v. Hernandez*, 921 F.2d 1569, 1582-83 (11th Cir. 1991) (despite the absence of a cautionary instruction, the district court did not abuse its discretion in allowing the government to introduce a codefendant's guilty plea when the government did not emphasize it or urge the jury to consider it); *United States v. Gorny*, 732 F.2d 597, 604 (7th Cir. 1984) (government's impeaching its own witness was not reversible error where it did not call the witness "merely for the purpose of introducing irrelevant evidence or of establishing the defendant's guilt by association with the witness"). Finally, the district court instructed the jury that it was to consider the evidence of Franks' prior convictions "solely in judging the credibility of the witness" and not to consider the evidence "for any purpose in judging the innocence or guilt of" West. *See Zafiro v. United States*, ___ U.S. ___, 113 S. Ct. 933, 939, 122 L. Ed. 2d 317 (1993) (noting that juries are presumed to follow their instructions). Accordingly, the district court did not abuse its discretion in allowing the government during direct examination to inquire about Franks' prior convictions.

## C

Prior to trial, West moved *in limine* for an order directing the government to refrain from offering evidence pertaining to (1) West's fluctuating, and generally declining, net worth, (2) West's purchase and use of cashier's checks during December

-19-

1987 and January 1988, (3) West's participation in cash transactions involving amounts of $9,500 during December 1987, January, May and June 1988, and February 1989, and (4) West's rental or use of one or more safe deposit boxes. The district court refused to consider the issue until the government sought to offer the evidence at trial. When the government did offer the evidence, West argued that the court should exclude it as evidence offered by the government merely to prove that he was a person of bad character.[22] Alternatively, West contended that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.[23] The district court overruled West's objections. On appeal, West offers the same arguments to convince us that the district court erred in admitting the challenged evidence.[24] The

---

[22] Fed. R. Evid. 404(b) prohibits the government from introducing such evidence to demonstrate the defendant's bad character:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[23] *See* Fed. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . .").

[24] We note that West's failure to specifically identify those portions of the record relevant to his claim of error borders on waiving any claim of error. *See* Fed. R. App. P. 28(a)(4) (noting that the argument section of the appellant's brief "shall contain the contentions of the appellant with respect to the issues presented, and reasons therefor, with citations to the . . . *parts of the record relied on*") (emphasis

government, on the other hand, contends that the challenged evidence is relevant both to West's intent))i.e., whether he acted in contemplation of bankruptcy or with the intent to defeat the provisions of title 11))and to plan))his scheme to deter and prevent creditors from tracing funds to which he had access.

When extrinsic offense evidence is offered, Rule 404(b) calls for a two-step approach.  First, evidence of prior extrinsic acts must be "relevant to an issue other than the defendant's character."  *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S. Ct. 1244, 59 L. Ed. 2d 472 (1979).  Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence."  Fed. R. Evid. 401.  "Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Rule 403."  *Beechum*, 582 F.2d at 911.

---

added).  Instead of adhering to the commands of Rule 28, West merely alleges that the Rule 404(b) evidence at issue was "quite significant:  see Volume 13, pp. 1351-1388, and virtually all of Vols. 14, 15, and Vol. 16;  Government Exhibits <u>269-363</u>."  Although West contends that "it is difficult if not impossible to simply extract those segments of the transcript where the evidence is addressed," we have reviewed the cited portions of the record and have found that much))if not most))of the testimony simply did not pertain to any challenged evidence.  Moreover, three of the 82 exhibits cited by West are directly relevant to Count 4 of the indictment, and West failed to object at trial to 11 additional exhibits when they were offered by the government.  We trust that in the future, counsel will specifically identify those portions of the record relevant to the contentions made in the briefs.

Evidence of prior extrinsic acts is admissible to prove "plan" where the existence of a plan is relevant to some ultimate issue in the case. *United States v. Krezdorn*, 639 F.2d 1327, 1331 (5th Cir. 1981). For example,

> evidence of an extrinsic offense may be admissible when it logically raises an inference that the defendant was engaged in a larger, more comprehensive plan. The existence of a plan then tends to prove that the defendant committed the charged crime, since commission of that crime would lead to the completion of the overall plan. This use of extrinsic evidence to establish the existence of a plan is allowed by Rule 404(b) because,
>
> > [it] involves no inference as to the defendant's character; instead his conduct is said to be caused by his conscious commitment to a course of conduct of which the charged crime is only a part. The other crime is admitted to show this larger goal rather than to show defendant's propensity to commit crimes.

*Id.* (quoting 22 Wright & Graham, Federal Practice & Procedure § 5244, at 500 (1978) (footnotes omitted)).

Evidence of prior extrinsic acts also is allowed by Rule 404(b) to establish that the defendant acted with the requisite criminal intent. *See United States v. Goodstein*, 883 F.2d 1362, 1370 (7th Cir. 1989) ("Fraudulent intent may be proved by circumstantial evidence."). "Persons whose intention is to shield their assets from creditor attack [using the bankruptcy laws] while continuing to derive the equitable benefit of [their] assets rarely announce their purpose. Instead, if their intention is to be known, it must be gleaned from inferences drawn from a course of

conduct." *In re May*, 12 B.R. 618, 627 (N.D. Fla. 1980). Consequently, to prove intent, the government may introduce evidence relevant to establishing that a defendant engaged in a course of conduct designed to defraud his creditors or the bankruptcy trustee.

We conclude that the district court did not err in finding that the evidence offered by the government was relevant to whether West acted with the requisite intent or whether he acted pursuant to a plan to defeat the rights of his creditors. For example, the financial statements prepared on West's behalf indicate that West's net worth fell dramatically after 1985. Because the deterioration of West's financial situation bears strongly on both his incentive and need to seek bankruptcy protection, such evidence is relevant not only to West's motive for hiding assets from creditors, but also indicated that it was very probable that he knew that he was going to file a petition in bankruptcy long before March 1990.[25] *See* 18 U.S.C. § 152 ¶ 7 (noting that the transfer or concealment of property must occur "in contemplation of a case under title 11" or "with intent to defeat the provisions of title 11" to constitute bankruptcy fraud); *see also United States v. Lerch*, 996 F.2d 158, 162 (7th Cir. 1993) (admission of tax court and bankruptcy court opinions from prior proceedings was proper under Rule 404(b) because they demonstrated the defendant's "motive for hiding

---

[25] West testified that he did not decide to file his bankruptcy petition until late March 1990.

assets").  Moreover, the financial statements generally were consistent with West's testimony that his net worth reached its peak of between seventeen and nineteen million dollars in 1985 and declined precipitously thereafter.[26]  Finally, we note that the district court gave the appropriate limiting instruction.[27] Consequently, the district court correctly found that the financial statements were relevant to the issue of intent.  *See United States v. Haymes*, 610 F.2d 309, 311-12 (5th Cir. 1980) (in bankruptcy fraud case, testimony given by the defendant's secretary that he was concerned about his company's "grave financial condition and the likelihood it would fall into bankruptcy" was relevant to intent;  when determining when the defendant began acting with the

---

[26]    In fact, West testified that by 1988, his net worth was "pretty well destroyed" and he practiced "survival techniques" in an effort to keep his business enterprises alive.

[27]    The district court cautioned:

You must not consider [the testimony regarding West's financial statements and the financial statements themselves] in deciding if the Defendant Bruce West, Sr. committed the acts charged in the Indictment. However, you may consider this evidence for other limited purposes.  If you find beyond a reasonable doubt from the other evidence in this case that the Defendant did commit the acts charged in the Indictment, then you may consider evidence of these Financial Statements to determine whether the Defendant had the state of mind or intent necessary to commit the crime charged in the Indictment or whether the Defendant committed the acts for which he is on trial in this case by accident or mistake.

13 R. at 1380.

requisite intent, "[a] jury must be allowed to put two and two together").

The evidence regarding West's purchase and use of cashier's checks during December 1987 and January 1988 also was relevant to the issue whether West acted with the requisite intent. Miriam Lewis, West's secretary, testified as to why West directed her to cash various checks and obtain cashier's checks:

> We had conversations about certain checking accounts that had been attached over periods of time. [West stated,] "If the money wasn't in a checking account, it couldn't be attached."

Moreover, the pattern of check use is similar and relatively close in time to the transactions undergirding the instant case, and the district court cautioned the jury not to use the evidence improperly.[28] *See Lerch*, 996 F.2d at 162 (admission of tax court

---

[28]    The district court instructed the jury as follows:

I want to instruct you that you may not consider [the testimony regarding West's use of cashier's checks and the checks themselves] in deciding if the Defendant Bruce R. West, Sr. committed the acts charged in the Indictment. However, you may consider this evidence for other very limited purposes.
    If you find beyond a reasonable doubt from other evidence in this case that the Defendant did commit the acts charged in the Indictment, then you may consider evidence of the checks that have just been admitted into evidence for other very limited purposes, to which you may consider to determine whether the Defendant had the state of mind, and I'm talking about the Defendant Bruce R. West, Sr., had the state of mind or intent necessary to commit the crime charged in the Indictment or whether the Defendant acted according to a plan or in preparation for commission of a crime.

14 R. at 1432.

-25-

and bankruptcy court opinions from prior proceedings proper under Rule 404(b) because the "events underlying both opinions are . . . similar and close in time to the instant case").

The government next introduced evidence pertaining to West's participation during December 1987, January, May and June 1988, and February 1989 in cash transactions involving amounts of $9,500. Lewis testified that starting in 1987, the amount of cash West obtained from various accounts that he had access to increased dramatically.[29] Prior to 1987, Lewis would cash checks only for travel expenses and petty cash. After a conversation with West during which they discussed the federal law requiring banks to report certain cash transactions to the Internal Revenue Service,[30] however, West directed Lewis to cash several checks in amounts of $9,500, thereby avoiding the reporting requirements. Thus, this evidence is relevant to whether West acted with the intent to defeat the provisions of the Bankruptcy Code and whether he acted pursuant to a plan to defeat the rights of his creditors. Consequently, the evidence was admissible under Rule 404(b).[31]

---

[29]    Lewis also related that West began talking to her about declaring bankruptcy in early 1987 and that those conversations occurred with increasing frequency between that time and 1990.

[30]    *See* 31 U.S.C. § 5313(a) (requiring financial institutions involved in a cash transaction exceeding $10,000 to file a report with the Secretary of the Treasury).

[31]    We note that the district court again cautioned the jury as to the appropriate use of this evidence:

Ladies and Gentlemen of the jury, any testimony with regard to obtaining cashier's checks for $9500 and any

Finally, we conclude that the district court did not err in admitting the evidence regarding West's rental or use of various safety deposit boxes. Lewis testified that during or after March 1989, as part of the duties relating to her employment with West, she went with West's daughter to First City Bank, where the daughter removed cash from a safety deposit box. Lewis and the daughter then proceeded to "several different banks and got cashier's checks." Lewis mailed the cashier's checks to Jack Franks, one of West's business associates. This evidence was relevant to the issue of intent because it indicated the existence a plan to hide West's assets and avoid attachment of his bank accounts, thereby defrauding his creditors.

**2**

West next contends that even if the challenged evidence was relevant under Rule 404(b), the district court should have excluded the evidence pursuant to Rule 403 because its probative value was

---

such checks admitted into evidence and testimony regarding them is not to be considered by you in deciding if the Defendant committed the acts charged in the Indictment. However, you may consider this evidence for other very limited purposes.

If you find beyond a reasonable doubt from other evidence in this case that the Defendant Bruce West, Sr. did commit the acts charged in the Indictment, then you may consider evidence of the checks obtained in the amount of $9500 and testimony regarding them for other very limited purposes. You may consider them to determine whether the Defendant had the state of mind or intent necessary to commit the crime charged in the Indictment or whether the Defendant acted according to a plan or in preparation for commission of a crime.

14 R. at 1440.

substantially outweighed by the danger of unfair prejudice. We must determine "whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decisions of this kind under Rule 403." Fed. R. Evid. 404(b) advisory committee's note. "The exclusion of evidence under Rule 403," however, "should occur only sparingly." *United States v. Pace*, 10 F.3d 1106, 1115 (5th Cir. 1993); *see also United States v. McRae*, 593 F.2d 700, 707 (5th Cir.) (noting that Rule 403's "major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect"), *cert. denied*, 444 U.S. 862, 100 S. Ct. 128, 62 L. Ed. 2d 83 (1979).

At trial, the only real issue in dispute involved West's intent))i.e., whether he acted in contemplation of declaring bankruptcy or with intent to defeat the Bankruptcy Code. Direct means of proof tending to make the existence of criminal intent on West's part more probable than it otherwise would be is generally unavailable in bankruptcy fraud prosecutions. *See In re May*, 12 B.R. at 627. Consequently, Rule 404(b) evidence indicating that West acted with the requisite intent was extremely important to the government's case. Furthermore, the prior acts occurred relatively close in time to the conduct charged in the indictment, thereby increasing the probative value of the 404(b) evidence. *See United States v. Rubio-Gonzalez*, 674 F.2d 1067, 1075 (5th Cir. 1982)

-28-

(upholding trial court's decision pursuant to Rule 404(b) to admit evidence of 10-year-old acts). Finally, the district court properly instructed the jury on four occasions as to the limitations on consideration of the extrinsic offense evidence.[32] *See United States v. Elwood*, 999 F.2d 814, 817 (5th Cir. 1993) (no Rule 403 breach where the trial court instructed the jury on three occasions of the limitations in the consideration of extrinsic offense evidence). Consequently, we conclude that the district

---

[32] In addition to the instructions given when the district court admitted the challenged evidence, *see* notes 27, 28, and 31 *supra*, the court gave the following instruction immediately before deliberations began:

> During the course of the trial, testimony or evidence was presented to you concerning alleged acts committed by the Defendant Bruce R. West, Sr. in addition to what has been alleged in the Indictment . . . . Such acts do not constitute any offense charged in the Indictment in this case, but it would, at most, constitute evidence of acts other than those alleged in the Indictment.
>     You must not consider any of this evidence in deciding if the Defendant Bruce R. West, Sr. committed the acts charged in the Indictment. . . . However, you may consider this evidence for other, very limited, purposes.
>     If you find beyond a reasonable doubt from other evidence in this case that the Defendant Bruce R. West, Sr. did commit the acts charged in the indictment, then you may consider evidence of the other acts allegedly committed on other occasions to determine:
>     One, whether the Defendant Bruce R. West, Sr. had the state of mind or intent necessary to commit the crime charged in the Indictment;
>     Two, whether the Defendant Bruce R. West, Sr. had the motive or the opportunity to commit the acts charged in the Indictment, or;
>     Three, whether the Defendant committed the acts for which he is on trial by accident or mistake.

26 R. at 3219-20.

-29-

court did not breach Rule 403 by admitting the Rule 404(b) evidence.

**D**

West's final assertion is that his trial was rendered fundamentally unfair because the district court refused to allow two bankruptcy experts))Philip Palmer and William H. Brister))to testify regarding the relationship between the Texas Homestead Act[33] and federal bankruptcy law. West contends that such testimony would have demonstrated that he at all times acted in good faith, and thus was relevant to the issue of his intent.[34] Here, West's good faith defense was centered upon his asserted reliance on the advice of his bankruptcy counsel))Philip Palmer))and his accountant))Nathan Reeder. Although both Palmer and Reeder testified they advised West to structure the Dondi Farms, Broadway building, and Frisco house transactions as he did and that the transactions were lawful, West contends that the district court erred in not allowing him to demonstrate "that it was reasonable to

---

[33]     Section 41.001 of the Texas Property Code provides that a homestead is "exempt from seizure for the claims of creditors." Tex. Prop. Code Ann. § 41.001 (Vernon Supp. 1994).

[34]     At trial, the government had the burden of proving that West "knowingly and fraudulently [transferred] or [concealed] any of his property" "in contemplation of a case under Title 11 . . . or with intent to defeat the provisions of Title 11." 18 U.S.C. § 152 ¶ 7. Thus, if West acted in good faith, he could not have acted with the fraudulent intent necessary to support a conviction for bankruptcy fraud. *See United States v. Zehrbach*, ___ F.3d ___, 1994 WL 96690, *4 (3d Cir. Mar. 28, 1994); *see also* McCullough, *Bankruptcy Fraud*, 26 Com. L.J. at 267 ("The role of advisors, such as attorneys, may affect a finding of intent.").

follow [the advice supplied by Palmer and Reeder]))a showing that of necessity would include some explanation of . . . what a Texas homestead exemption was, and how one could lawfully preserve it, under bankruptcy law."[35]

Under Fed R. Evid. 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Here, the critical issue at trial was whether West acted in good faith and relied upon the advice of counsel. Thus, the district court correctly allowed West to testify that he at all times relied in good faith upon the advice of experts and both Palmer and Reeder to testify that they advised West to structure the transactions as he did.[36] *Cf. Miller v. United States*, 120 F.2d

---

[35] West informed the district court that Brister and Palmer

> would . . . have been able to testify to the Texas Homestead Law concerning the use of proceeds from the sale of a homestead for a six-month period, the reinvestment of those proceeds in a new homestead, and the exempt nature of the note payments [as] such proceeds.

25 R. at 3131.


[36] The district court, in fact, comprehensively explained to the jury West's advice of counsel defense:

> The defense in this case contends that the actions of Bruce R. West, Sr. concerning the acquisition of the Parkway Notes from the FDIC, the foreclosure of the

Broadway Building, Exalter's involvement in the exchange of the Broadway Building for the Frisco House, the subsequent transfer of the Frisco House to West, Sr. and the associated transfer of funds by West, Sr., did not constitute a fraud on West, Sr.'s creditors, the trustee in bankruptcy, or any other person, and that such transactions were structured based on advice from his attorney and accountant.

. . . .

If, before taking the actions charged in the Indictment, Bruce West, Sr., while acting in good faith and for the purpose of securing advice on the lawfulness of his possible future conduct, sought and obtained the advice of an attorney or accountant whom he considered to be competent, and made a full disclosure of all important and material facts of which he had knowledge or had the means of knowing, and acted in accordance with the advice his attorney or accountant gave following this full report or disclosure, then the Defendant would not be willfully or deliberately doing a wrong in performing or omitting some act the law forbids or requires.

However, reliance upon the advice of an attorney or an accountant is not an absolute defense to the crimes charged in the Indictment. Rather, it is a circumstance which you should consider in determining whether a Defendant was acting in good faith or without fraudulent intent. No one can willfully and knowingly violate the law and excuse himself by simply claiming that he followed the advice of an attorney or accountant. Rather, for advice of an attorney or accountant to be considered as a circumstance that disproves fraudulent intent, the evidence must show that the advice was given after a Defendant made a full and accurate report or disclosure to his attorney or accountant of all the important and material facts of which the Defendant Bruce R. West, Sr. had knowledge or had the means of knowing. The evidence must also show that the Defendant acted in accordance with the advice that his attorney or accountant gave following this full report or disclosure.

Whether Defendant Bruce West, Sr. acted in good faith for the purpose of truly seeking guidance as to questions about which he was in doubt, and whether he made a full and complete report or disclosure to his attorney or accountant, and whether he acted in accordance with the advice received, are all questions for the jury to determine.

968, 970 (10th Cir. 1941) (stating that the defendant may buttress his testimony of lack of intent "with testimony of relevant circumstances, including conversations had with third persons or statements made by them, tending to support his statement that he had no intent to defraud").  Moreover, the district court further allowed Palmer to testify that:  (1) West made full disclosure regarding the transactions;  (2) he advised West that the Frisco house transaction "was a legal and proper transaction";  (3) the Frisco house transaction caused no harm to West's creditors;  (4) the Jett note was exempt from the claims of creditors;  (5) the Jett note retained its exempt status after the Frisco house transaction because it was "used in the acquisition of the new homestead which is what [the homestead] exemption is all about";  and (6) he advised West that West was free to use payments made both pursuant to the Jett note and after West had sought bankruptcy protection because such payments were exempt.  Consequently, West's defense))that he in good faith relied on the advice of counsel))was squarely placed before the jury.[37]  Because the typical juror is

---

26 R. at 3251-53.  On appeal, West does not independently challenge the jury instructions, but instead contends that the district court's refusal to allow expert testimony, in light of the jury instructions, rendered his trial fundamentally unfair. To the extent West intended to challenge the sufficiency of the jury instructions, he has failed to brief the issue and, therefore, has waived it.  *See Edmond v. Collins*, 8 F.3d 290, 292 n.5 (5th Cir. 1993).

[37]     Indeed, the issue of intent was squarely placed before the jury in light of West's explicit testimony that he never acted with the intent to defraud his creditors, the bankruptcy trustee, or anyone else.

qualified to determine intelligently and to the best degree possible both the reasonableness of a client relying upon the advice of an attorney and accountant retained to render such advice and whether the client did so in good faith after making full disclosure, expert testimony as to the legal basis underlying the advice))i.e., the reasonableness of their interpretation of the provisions of the Texas Homestead Act))would not have assisted the jury. *See* Fed. R. Evid. 702 advisory committee's note (noting that the test "for determining when experts may be used" is "the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject") (internal quotation omitted). Accordingly, the district court did not abuse its discretion in refusing to admit expert testimony regarding the Texas Homestead Act.

West nonetheless contends that precedent required the district court to admit the experts' testimony. West primarily relies upon *United States v. Garber*, 607 F.2d 92, 97-100 (5th Cir. 1979) (en banc), where we held that because the taxability of the unreported income at issue was uncertain *as a matter of law*, the trial court erred in excluding the testimony of an expert about the unresolved nature of the law.[38] We find *Garber* inapposite given the

---

[38] Garber was one of only two or three persons in the world whose blood was known to contain a certain valuable antibody. She thus was able to generate substantial income by

substantial differences between the facts of that case and the case *sub judice*.[39]  For example, the trial court in *Garber* refused to allow the defendant to present any testimony suggesting that the law supported her actions.  *Id.* at 99 ("By disallowing [the expert's testimony] that a recognized theory of tax law supports Garber's feelings, the court deprived the defendant of evidence showing her state of mind to be reasonable.").  Here, however, the district court allowed West to testify both that he consulted with Reeder and Palmer before structuring the Dondi Farms, Broadway

---

selling her blood plasma.  Because Garber failed to report this income, the government prosecuted her for the willful evasion of income taxes.  At trial, the government conceded that the taxability of income generated by selling blood plasma was an issue of first impression.  Thus, Garber sought to introduce the testimony of a certified public accountant that a recognized theory of tax law supported Garber's belief that such income was not taxable.  Considering the question of taxability to be one of law, the trial court refused to allow the proffered testimony and instructed the jury that the income Garber received from the sale of her blood was taxable. *Garber*, 607 F.2d at 94-96.  We reversed Garber's conviction, holding that the expert's testimony was relevant to the issue of Garber's intent:

> The tax treatment of earnings from the sale of blood plasma or other parts of the human body is an unchartered area in tax law.  The parties in this case presented divergent opinions as to the ultimate taxability by analogy to two legitimate theories in tax law.  The trial court should not have withheld this fact, and its powerful impact on the issue of Garber's willfulness, from the jury.

*Id.* at 99.

[39]    In prior cases, we have "limited *Garber* to its bizarre facts))where the level of uncertainty [of the applicable law] approached legal vagueness." *United States v. Daly*, 756 F.2d 1076, 1083 (5th Cir. 1985) (citing *United States v. Burton*, 737 F.2d 439, 443-44 (5th Cir. 1984)).

Building, and Frisco house transactions and that he followed their advice. Additionally, the district court allowed both Palmer and Reeder to testify that they advised West to structure the transactions as he did and that the transactions were perfectly legal. Thus, West's reliance upon *Garber* is misplaced.[40] Moreover, West has not argued on appeal that the relevant law was unsettled, that he or his advisors subjectively saw any such uncertainty, or that his advisors explained the Texas Homestead Act to him in anything other than very general terms. *See United States v.*

---

[40] West's reliance upon *Cheek v. United States*, ___ U.S. ___, 111 S. Ct. 604, 112 L. Ed. 2d 617 (1991), *United States v. Onumonu*, 967 F.2d 782 (2d Cir. 1992), and *United States v. Lankford*, 955 F.2d 1545 (11th Cir. 1992), is similarly misplaced. *Cheek*, which merely held that the jury in a criminal tax fraud case must be allowed to consider the defendant's subjective understanding of the legality or illegality of his acts, 111 S. Ct. at 609-11, does not provide West with any support because the district court allowed the jury to consider West's subjective intent. *Lankford* held that the trial court erred in totally excluding expert testimony relevant to the defendant's intent to commit tax fraud. 955 F.2d at 1551 & n.14 (expert testimony as to whether a campaign contribution should be classified as a gift or as income, an issue about which most jurors "simply lack the specialized knowledge, background, and experience needed to assess the reasonableness of the" defendant's gift/income characterization). In *Onumonu*, the defendant, an alimentary-canal drug smuggler on trial for importing heroin, testified that he thought he was smuggling diamonds, not heroin. The trial court excluded expert testimony offered by the defendant regarding the feasibility and profitability of smuggling diamonds in the alimentary canal. The Second Circuit held that the trial court erred in excluding such testimony because it was relevant to the defendant's intent and the average juror knows very little "about the feasibility of internally smuggling diamonds by swallowing [diamond-filled] condoms." 967 F.2d at 788. We find the latter cases distinguishable from the case at bar, where West testified as to both his subjective intent and his reliance upon the advice of his retained experts and West's attorney and accountant each testified regarding the advice they gave West.

-36-

*Harris*, 942 F.2d 1125, 1132 n.6 (7th Cir. 1991) (noting that where the defendant or his tax advisors may have subjectively, but wrongly, seen an ambiguity, the defendant may present evidence to the jury demonstrating the basis of the erroneous, good faith belief). The typical juror is perfectly capable of determining, based on the evidence presented, whether West acted in good faith, disclosed all the relevant facts, and then acted in reliance upon the advice obtained. Consequently, we must reject West's contention that the district court erred in excluding the proposed testimony regarding the provisions of the Texas Homestead Act. *Cf. United States v. Burton*, 737 F.2d 439, 444 (5th Cir. 1984) (noting that the trial court "ordinarily will be the sole source of the law").

**V**

For the foregoing reasons, we AFFIRM the judgment of the district court.