KIDDER, PEABODY & CO.,
INCORPORATED,
Plaintiff,

v.

IAG INTERNATIONAL ACCEPTANCE
GROUP N.V., Defendant.

No. 94 Civ. 4725(CSH).

United States District Court,
S.D. New York.

July 22, 1998.

Carl H. Lowenson, Jr., Morrison & Foerster, LLP, New York, NY, Myron Kirschbaum, Kaye, Scholer, Fierman, Hays & Handler, LLP, New York, NY, for Kidder, Peabody & Co., Inc.

Samuel Rosenthal, Curtis, Mallet-Prevost, Colt & Mosle, Washington, DC, for IAG Intern. Acceptance Group, N.V.

*MEMORANDUM OPINION
AND ORDER*

HAIGHT, Senior District Judge.

This motion to preclude evidence requires the Court to decide whether a party, defending itself at a jury trial against claims of abuse of the process of attachment and malicious prosecution, may offer expert opinion testimony from a professor of law with respect to the propriety of its conduct and that of its retained counsel.

I.

Familiarity is assumed with all the prior opinions in this case, by this Court and by the supervising Magistrate Judge. It is sufficient for present purposes to say that on

June 27, 1994, plaintiff Kidder, Peabody & Co., Inc. ("Kidder") commenced this action against defendant IAG International Acceptance Group, N.V. ("IAG") for breach of an alleged agreement whereby IAG retained Kidder as its exclusive underwriter for a three-year period to engage in the securitization of auto loans. Upon filing of its action in this Court, Kidder obtained an *ex parte* order of attachment. Thereafter, in the circumstances described in the prior opinions, the attachment was vacated and summary judgment granted to IAG, disposing of all Kidder's claims against IAG. But IAG has asserted six counterclaims against Kidder, which will be tried by a jury.

Kidder served its order of attachment upon, *inter alia*, Auto Marketing Network, Inc. ("AMN") and CS First Boston ("First Boston"), with whom IAG was negotiating an auto loan purchase transaction. In IAG's perception, Kidder had failed to close the earlier agreement with IAG, and it became incumbent upon IAG to mitigate its damages by finding a substitute underwriter. IAG alleges that as the result of service of Kidder's complaint and order of attachment upon AMN and First Boston, "First Boston and AMN both refused to perform in accordance with their agreement with IAG, and First Boston insisted instead on consummating a whole loan sale transaction involving solely AMN on June 30 1994, without involving IAG," to IAG's financial detriment. First Amended Counterclaim ("FAC"), ¶¶ 39–40.

In these alleged circumstances, IAG asserts six counterclaims against Kidder: Count One, fraudulent misrepresentation; Count Two, negligent misrepresentation; Count Three, abuse of process (the order of attachment); Count Four, damages resulting from the attachment; Count Five, tortious interference with contract and business relations; and Count Six, malicious prosecution.

The present motion implicates Counts Three, Four, and Six. IAG's theory of the case is in suing IAG and obtaining an order of attachment, Kidder acted with malice and for a "wholly improper and perverted purpose, namely the interference with IAG's contracts and business relationships with First Boston, AMN, and others, and to terminate IAG as an ongoing business, and ruin it financially, as retaliation for IAG's decision to use an investment banker other than Kidder, and other improper reasons." FAC, ¶¶ 64, 82.

■ IAG thus charges Kidder with malicious prosecution. "In order to state a claim for the tort of malicious prosecution under New York State law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir .1997) (citation and internal quotation marks omitted). While *Murphy v. Lynn* arose in the context of a criminal prosecution, the same elements of malicious prosecution must be shown where the initial proceeding was civil. *See Pinsky v. Duncan*, 79 F.3d 306, 312–13 (2d Cir.1996). Thus one element that IAG must prove is that in suing IAG for breach of contract and obtaining an order of attachment, Kidder was motivated by actual malice.

Kidder's theory of the case is that it acted in good faith and without malice. In that regard, Kidder stresses that before suing IAG and obtaining an order of attachment, it retained and consulted outside counsel, the firm of Miller & Wrubel ("M & W").

In aid of that defense, Kidder wishes to call as an expert witness at trial Professor Arthur R. Miller, the Bromley Professor of Law at Harvard Law School and noted authority on Federal civil practice. Professor Miller's report has been furnished to IAG's counsel as initial discovery under Rule 26(a)(2) and 26(b)(4), Fed.R.Civ.P. On the basis of that report, IAG now moves *in limine* to preclude Professor Miller's opinions.

As a fallback position, IAG has also retained former Federal judge Arlin M. Adams as its expert witness on the subjects upon which Professor Miller opines. IAG has served counsel for Kidder with Judge Adams' opinion. Neither expert has as yet been deposed. Successor outside counsel for Kid-

der [1] state their intention of moving to disqualify Judge Adams, on the ground of an asserted attorney-client relationship between Kidder and the firm Judge Adams has served as counsel since his retirement from the bench. Since the participation of Judge Adams in the case would be mooted if IAG succeeds on its present motion to preclude the testimony of Professor Miller, Judge Adams' status is being held in abeyance.

## II.

Considerable pretrial discovery has taken place, part of which is reflected in the papers submitted on the present motion.

It appears that the Kidder employees who were involved in the decision to sue IAG were two "principal bankers," Stephen E. Deckoff and James E. Walker; Paul Saltzman, an "in-house deal lawyer"; and Peter Salerno, "the in-house litigator." [2] The attorneys at M & W who dealt with the case in its early stages were Joel Miller and Charles Jacob.

Professor Miller reviewed the documents and depositions generated by discovery. According to his report, dated November 3, 1997:

> Telephone conversations on June 24 and 27, 1994, among Joel Miller of Miller and Wrubel and the two bankers and the two lawyers at Kidder gave Joel Miller the factual background from which he could advise Kidder on its legal situation.

*Id.* at 2. The M & W lawyers were given the contract upon which Kidder eventually brought suit. *Id.* June 25–26 was a weekend, *id.* at 3, so June 24 was a Friday. While IAG says that Kidder filed this action on "June 28, 1994," Main Brief at 2, in point of fact the Court's docket sheets show that Kidder, represented by M & W, filed its complaint and order of attachment on Monday, June 27, 1994. The complaint was entered on the docket on June 28, 1994, and the order of attachment, endorsed by this Court in the interim, on June 29, 1994.

## III.

Kidder's defense, that it acted in good faith and upon the advice of counsel in suing IAG and obtaining and serving an order of attachment, implicates the principles expressed with respect to malicious prosecution in the *Restatement (Second) of Torts* § 675 (1977):

> One who takes an active part in the initiation, continuation or procurement of civil proceedings against another has probable cause for doing so if he reasonably believes in the existence of the facts upon which the claim is based, and either
>
> > (a) correctly or reasonably believes that under those facts the claim may be valid under the applicable law, or
> >
> > (b) believes to this effect in reliance upon the advice of counsel, sought in good faith and given after full disclosure of all relevant facts within his knowledge and information.

The Second Circuit quoted this section of the *Restatement* in *Pinsky v. Duncan,* 79 F.3d at 312, and described its provisions as "a more modern definition of probable cause to initiate civil proceedings."

Within these parameters of liability, the Kidder employees who participated in the initiation of the suit against IAG and the obtaining of an order of attachment will be able, if consistent with their oaths, to testify to the jury that at all times they acted in good faith; that at the pertinent times they relied in good faith upon the advice of outside counsel, M & W; and that they made full disclosure to M & W of all the relevant facts within their knowledge and information. The M & W attorneys will be able, for their part, to describe to the jury the facts that Kidder disclosed to them, and the advice that M & W gave to Kidder before the suit was commenced and the order of attachment obtained. Counsel for IAG may cross-examine those witnesses, and offer evidence probative of the issue of Kidder's good faith. The Court will instruct the jury on (1) the elements of the claim for breach of contract that Kidder asserted in its complaint against IAG,

---

1. By consent order dated March 6, 1997, the firm of Morrison & Foerster was substituted for M & W as trial counsel for Kidder.

2. These names and identifying phrases are taken from Professor Miller's report at 2.

(2) the elements of the claim for malicious prosecution that IAG asserts in its counterclaim against Kidder and Kidder's defense of advice of counsel, and (3) the elements that a litigant must allege to obtain an order of attachment. At the end of the trial, the jury will be required to determine, as it must in all malicious prosecution cases, "both the reasonableness of a client relying upon the advice of an attorney ... retained to render such advice and whether the client did so in good faith after making full disclosure," *United States v. West,* 22 F.3d 586, 599 (5th Cir.1994).

■ The question presented by IAG's motion to preclude is whether the jury, in determining the existence of good faith or malice on Kidder's part in suing IAG and obtaining an order of attachment, would be assisted in a manner the Federal Rules of Evidence allow by Professor Miller's opinions.[3]

## IV.

Professor Miller's opinions, set forth in his report, are collected under two main points, quoted in Kidder's brief at 16 and 19:

"I. Kidder sought and received advice from its outside counsel, Miller & Wrubel, relating to the dispute between Kidder and IAG, and used that advice consistent with the way in which a typical business client relies on its outside counsel."

"II. Kidder and Miller & Wrubel both reasonably believed that Kidder had a prima facie case of breach of contract against IAG, had proper grounds for seeking an order of attachment, and properly did not move to confirm the attachment."

Under each of these two main points, Professor Miller recites facts gleaned from discovery and expresses additional opinions supportive of his main points. These recitations and opinions are expressed in lettered paragraphs, some of which are supported by subparagraphs. I will quote from the lettered paragraphs.

*Point I.A:* "Kidder gave Miller & Wrubel what Kidder understood to be the relevant facts relating to the negotiations and arrangements between Kidder and IAG." In over two pages of supporting sub-paragraphs, Professor Miller cites to testimony and documents generated by discovery, in aid of his summary of what the Kidder and M & W people were saying to each other and the meanings those individuals placed upon what was being said. To that purportedly factual summary, Professor Miller contributes an occasional conclusion of his own, *viz.*, "Kidder, like any client, reasonably could believe that its outside counsel would read the documents that Kidder had provided and either understand them or ask questions of the in-house lawyers and the bankers to clarify anything that Miller & Wrubel needed to understand in order to evaluate the legal situation," ¶ I.A.3.e, and "[t]here was no need for Kidder to disclose to Miller [and Wrubel] Moody's problems with the proposed securitization," ¶ I.A.7.

*Point I.B:* "Salerno expected Miller & Wrubel to gather the relevant facts before instituting a legal action." For this proposi-

---

3. I note, but do not presently decide, the question whether a claimant must prove malice separately with respect to (1) the initiation of an action, and (2) obtaining an order of attachment in aid of that action. The Second Circuit, construing New York law, has said that "[t]he torts of malicious prosecution and abuse of process are closely allied." *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994). The Court of Appeals stated in *Cook* that a malicious abuse of process claim requires the claimant to show, *inter alia,* that the defendant acted "with intent to do harm without excuse or justification," and "in order to obtain a collateral objective that is outside the legitimate ends of the process," *id.,* which is to say, that he acted with malice. On the other hand, *Pinsky v. Duncan,* 79 F.3d at 313, holds that "an action for

malicious prosecution or wrongful civil proceeding extends to claims for damages arising from an improper attachment," so that the continuation of an attachment under certain circumstances "may give rise to a claim for damages provided the other elements of malicious prosecution are established in connection with the failure to discontinue." Presumably the same analysis would apply to obtaining an order of attachment in the first place, so that damages for the attachment may flow as a natural consequence of the malicious prosecution.

These considerations may be further explored at trial. The present motion requires consideration of the jury's ability to resolve the decisive fact issues without the assistance of the proffered expert opinion testimony.

tion, Professor Miller cites to Salerno's deposition testimony.

*Point I.C:* "If Miller & Wrubel needed further documents or information from Kidder, it could have asked for them." There is no citation to the record on discovery; this is an *ex cathedra* conclusion of Professor Miller's.

*Point I.D:* "There is no indication from the documents I have examined or the deposition testimony that I have reviewed that Kidder attempted to withhold potentially harmful information from Miller & Wrubel." Professor Miller then lists the depositions he has read.

*Point I.E:* "Kidder reasonably understood that Joel Miller had extensive experience concerning the securities industry, the New York Civil Practice Law and Rules, and the law relating to the procedure for and the grounds for procuring an order of attachment." Professor Miller cites to the deposition testimony of Joel Miller and Salerno.

*Point I.F:* "Kidder's in-house litigation counsel undoubtedly were aware that Miller & Wrubel had an independent obligation to the United States District Court under Federal Rule of Civil Procedure 11 and the Code of Professional Responsibility not to file a frivolous lawsuit. Kidder reasonably could rely on Miller & Wrubel to evaluate the case and all of the papers it would submit to the court in a way that would satisfy the obligation of Miller & Wrubel lawyers under Rule 11 and the Code." These two sentences are not referenced to anything in the evidentiary record; nor could they be. The first sentence reflects Professor Miller's conjecture about the state of mind of Kidder's in-house counsel; the second sentence builds a conclusion of reasonable reliance upon that conjecture. The sub-paragraphs in support of Point I(F) consist of quotations from Rule 11 and the Code of Professional Responsibility.

*Point I.G:* "Even aside from Federal Rule 11 and the relevant disciplinary and ethical rules, business organizations hire outside counsel in order to receive independent ex-

pert legal advice that they can rely on in planning their future course of conduct. A client can reasonably expect a lawyer to tell the client not to file a lawsuit that has little or no prospect of success. Kidder appears to have expected exactly that from Miller & Wrubel. Kidder in general relied on advice of outside counsel in determining whether there were sufficient facts to support a complaint." This paragraph proceeds from a general proposition to a description of a particular state of mind of the Kidder personnel. It is supported by a reference to two pages of Salerno's deposition.

*Point I.H:* "Each lawyer acted as a separate check on Kidder's decision to sue IAG. If any of the lawyers (Saltzman, Salerno, Wise,[4] Miller, Jacob) had thought the lawsuit should not be brought, it would not have been brought." The main thrust of this paragraph is to describe the states of mind and intentions of the lawyers involved. The two supporting sub-paragraphs refer to pages of Salerno's deposition and to his contemporaneous notes.

*Point I.I:* "Based on Miller & Wrubel's advice, Salerno and Wise believed that Kidder had a strong case for establishing a breach of contract." This sentence undertakes to describe the state of mind of Salerno and Wise. It references certain pages of Salerno's deposition.

*Point I.J:* "In these circumstances, it was appropriate and consistent with good legal practice for Kidder to rely on the advice of its outside counsel." In this sentence, Professor Miller expresses his opinion that Kidder should prevail on each of the related but discrete issues posed by § 675 of the *Restatement,* namely, whether Kidder believed its contract claim against IAG to be valid "in reliance upon the advice of counsel, sought in good faith and given after full disclosure of all relevant facts within [Kidder's] knowledge and information." § 675(b).

I will follow the same format in analyzing Professor Miller's presentation under Point II of his report. In that Point, it will be recalled, Professor Miller expresses his opin-

---

**4.** This is a reference to H. Lake Wise, not previously identified in Professor Miller's opinion, and described as Salerno's "superior at Kidder" in ¶ I(H)(1).

ion that, "Kidder and Miller & Wrubel both reasonably believed that Kidder had a prima facie case for breach of contract against IAG, had proper grounds for seeking an order of attachment, and properly did not move to confirm the attachment."

*Point II.A:* "As to the contract claim, Kidder needed to show only probable success on its contract claim to meet the standards for an attachment under Article 62 of New York's CPLR." The succeeding sub-paragraphs under Point II.A are apparently intended to demonstrate that such probable success existed. Professor Miller cites to the deposition testimony of certain Kidder and M & W witnesses and their notes.

At times these record citations are used to support Professor Miller's descriptions of what these witnesses were thinking at the time, *viz.*, "Kidder believed that the deal documents were prepared 'pursuant to the contract,'" ¶ II.A.1, citing to Salerno's deposition; "Jacob construed the PPM as consistent with the January 25, 1994 contract, since it reached the same result with a different funding mechanism," and "believed that Kidder's case could be made without calling the shift in the deal terms a legal modification," ¶ II.A.2.c, citing to Charles Jacob's deposition.

At other times Professor Miller takes the analysis one step further and contributes his own evaluation of the events, *viz.*, "Kidder *appears to have proceeded in the good faith belief* that it had a binding commitment from IAG to engage in the auto loan financing and that IAG had repudiated the arrangement," ¶ II.A. (emphasis added), and "[t]he statute of frauds issue was not obvious to Kidder or Miller & Wrubel, *nor should it have been.*" *Id.* (emphasis added).[5] Professor Miller supports that assertion in his following sentence: "There is no evidence in the documents or depositions that the lawyers thought of or discussed this issue, or communicated with

Kidder about the issue, prior to filing the complaint." While the difficulties with certain of Professor Miller's opinions are discussed under Point V, *infra*, I will observe *en passant* that it hardly follows from the lawyers' failure to think about the statute of frauds issue that they should not have done so.

*Point II.B:* "The order of attachment was reasonably sought by Miller & Wrubel under the circumstances that existed at the time." In a series of sub-paragraphs, Professor Miller supports that view with his analysis of Rule 64, Fed.R.Civ.P., and §§ 6201(1) and 6112(a) of the N.Y. CPLR, together with citations to the discovery record to show what the individuals knew or believed, *viz.*, "Joel Miller was not aware of any basis for piercing the corporate veil of IAG to reach any other entity or person for purposes of collecting any judgment that might be secured against IAG," ¶ II.B.1.f.; "Joel Miller and Charles Jacob were satisfied that grounds for an attachment existed," ¶ II.A.4. Professor Miller adds his own evaluations, *viz.*, "Kidder and Miller & Wrubel had no reason to believe that service of the order of attachment on First Boston would affect its willingness to do business with IAG," ¶ II.B.5; "[t]he notion that Kidder had malevolent motives simply defies commercial reality," ¶ II.B.5.a.

*Point II.C:* "There are at least four reasons why Kidder acted reasonably in not moving to confirm the attachment. Each of these reasons provided a legitimate and completely sufficient rationale for Kidder not to pursue the attachment." The following sub-paragraphs describe the reasons identified by Professor Miller to support his conclusion that "Kidder acted reasonably." The first three refer to tactical and public relations considerations testified to by Kidder and M & W witnesses during their depositions. The fourth "reason" consists of Professor Miller's

5. As Professor Miller acknowledges later in his report, *see* Point II.E, this Court granted IAG summary judgment on the basis of the New York statute of frauds. To the extent that Professor Miller's views express disagreement, explicit or implicit, with the Court's opinions, on that issue or any other, I may perhaps be forgiven a personal sense of relief that my opinions were not research papers submitted to Professor Miller for grading. The more pertinent consideration, discussed under Points V and VI of this opinion, is that it is for the trial judge, and not an expert witness, however eminent, to declare the governing law in the case and instruct the jury upon it. My papers are graded by the Court of Appeals.

assertion that "a litigant has no obligation under CPLR Article 62 to move to confirm an attachment."

*Point II.D:* "The limited time available to Kidder and Miller & Wrubel to protect Kidder's interests prior to filing for the attachment is an important factor in assessing the reasonableness of Kidder's and Miller & Wrubel's actions in commencing the litigation and seeking the order of attachment." In the following sub-paragraphs, Professor Miller derives from the Advisory Committee Notes to Rule 11, Fed.R.Civ.P., the proposition that counsel should evaluate the certification of a pleading "on the basis of what was known at the time of the signing," ¶ II.D.1.a, and then opines that Kidder and M & W acted reasonably on the basis of their witnesses' contemporary knowledge. In reaching that conclusion, Professor Miller paraphrases what Kidder "believed" and Kidder's "assumption" about IAG's assets. *See* ¶ II.D.2.a, ¶ II.D.2.b.[6]

*Point II.E:* "That District Judge Haight later granted summary judgment to IAG based on his construction of the New York statute of frauds does not mean that the complaint was not filed in good faith." Professor Miller expands upon this opinion in ¶ II.E .1: "The statute of frauds issue was neither simple nor apparent, as evidenced by Judge Haight's lengthy opinion and the highly technical character of the defense." These are stimulating thoughts, worthy of a Socratic dialogue. I wonder, for example, whether there is empirical evidence supporting Professor Miller's theory that the complexity of a legal issue is measured by the amount of judicial ink spilled to explicate it. My sense is that Justice Holmes wrote opinions of just a few lucid paragraphs which decided constitutional questions of great complexity and moment, while lesser judges are sometimes prone to go on at tedious length about points of law both simple and apparent. With re-

spect to that particular judicial sin, I am in no position to cast the first stone. But that is not the issue on this motion to preclude. The issue is whether, under the Federal Rules of Evidence and governing case law, Professor Miller's opinions may in whole or in part be placed before the jury.

### V.

Rules 701–706, F.R.Evid., govern opinions and expert testimony, which are also subject to the relevancy provisions of Rules 401–403. Rules 702, 703, and 704 address the admissibility of the testimony of an expert witness called by a party.

Rule 702 allows a qualified expert to testify "in the form of an opinion or otherwise" if the witness's "scientific, technical, or other specialized knowledge will assist the trier of the fact to understand the evidence or to determine a fact in issue ..." Rule 703 provides that "[t]he facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." Rule 704(a) provides that, with an exception not pertinent to this case, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

The Advisory Committee Notes describe the purpose of Rule 704(a):

> The basic approach to opinions, lay and expert, in these rules is to admit them when helpful to the trier of fact. In order to render this approach fully effective and to allay any doubt on the subject, the so-called "ultimate issue" rule is specifically abolished by the instant rule.

However, the Notes go on to caution:

> The abolition of the ultimate issue rule does not lower the bar so as to admit all

---

**6.** Professor Miller also opines that "[t]he complaint was based on a plausible, nonfrivolous view of the law," because there were "reasonable arguments" that, *inter alia,* "there was no statute of frauds defense that might bar the action." ¶ II.D.2.c. Professor Miller's seeming implication that the statute of frauds formed the subject of a reasoned, pre-filing discussion among the Kidder and M & W lawyers is inconsistent with his

assertion in ¶ II.A.2, previously noted, that there was no evidence in the record that "the lawyers thought of or discussed" the statute of fraud issue before filing suit against IAG. Professor Miller restates that theme in ¶ II.E.4 of his report ("[t]here is no evidence that anyone at Kidder or Miller & Wrubel considered the statute of frauds issue before filing the complaint.").

opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the. jury what result to reach, somewhat in the manner of oath-helpers of an earlier day.

The proper application of the expert opinion rules has generated a great deal of litigation, in this circuit and elsewhere. Each case turns upon its own circumstances. It may not be possible to reconcile all the reported decisions. The analysis that follows looks in the first instance to Second Circuit authority.

However, as a preliminary matter, it is apparent without citation to authority that, even if certain aspects of Professor Miller's opinions are admissible at trial (a question considered *infra*), much that appears in his written report could not take the form of testimony by Professor Miller to the jury.

First, Professor Miller could not testify as to what Kidder or M & W people did, or what they said to each other. That evidence must come from the trial testimony of the individuals concerned, where it will be subject to cross-examination.

Second, Professor Miller could not testify as to the mental processes of the Kidder and M & W people: what they knew, believed, assumed, or understood, on the basis of their own knowledge or communications from others. Again, that evidence must come from the trial testimony of the individuals concerned.

Third, Professor Miller could not testify as to facts that have no support in the evidence generated by witnesses with knowledge of the facts.

Under the usual format, which I would follow at trial if Professor is entitled to testify at all, Kidder's fact witnesses would testify first. Professor Miller would then be asked to respond to hypothetical questions based upon the prior testimony. This procedure allows the factual underpinnings of the expert's opinions to be tested by cross-examination, which in turn gives (1) opposing counsel an opportunity to make a fully informed objection to the hypothetical as posed, and (2) practical meaning to the Court's standard instruction that the jurors must consider the factual bases for an expert's opinion, in deciding whether or not to accept it.

I would imagine that able trial counsel for Kidder know all this, and proffer Professor Miller's report as, in part, an explanation of his opinions, based on the evidence elicited during discovery. Moreover, it seems likely that the Kidder and M & W witnesses will testify at trial in a manner consistent with Professor Miller's paraphrases of their depositions in his report. Indeed, it would not be surprising if the Kidder and M & W witnesses found in Professor Miller's report a useful chart by which to navigate their testimonial courses. In these circumstances, one may usefully derive from Professor Miller's report those opinions which lie at the heart of his presentation; and then consider whether those opinions are admissible under the rules of evidence.

The main thrust of Professor Miller's opinion is that Kidder reasonably relied upon M & W's advice in suing IAG and obtaining an order of attachment, both Kidder and M & W having formed the reasonable belief that sufficient legal grounds existed to pursue that course. While Professor Miller's report is cast in terms of-the reasonableness of Kidder's and M & W's conduct, it is the functional equivalent of an opinion that Kidder did not act with malice, since one who in good faith relies upon the advice of counsel has probable cause to initiate civil proceedings, and so does not act maliciously. *Pinsky v. Duncan*, 79 F.3d at 312.

Accordingly Professor Miller's opinions "embrace[ ] an ultimate issue to be decided by the trier of fact," a function sanctioned by Rule 704(a), so long as those opinions do not "merely tell the jury what result to reach," an effect explicitly condemned by the Advisory Committee Notes. Nor may Professor Miller's opinions usurp the trial judge's function of instructing the jury on the law. I now consider whether Professor Miller's proffered opinions cross the line into these forbidden territories. I focus first upon Second Circuit decisions.

In *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir.1994), the Second Circuit summarized the general principles of admissibility of expert opinions:

> Generally, the use of expert testimony is not permitted if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it. When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury. When this occurs, the expert acts outside his limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination. In evaluating the admissibility of expert testimony, this Court requires the exclusion of testimony which states a legal conclusion.

*Id.* (citations and internal quotation marks omitted).

Notwithstanding these strictures, the court of appeals in *Duncan* held admissible the testimony of an IRS agent, who participated in the investigation of a complicated land and tax fraud scheme, to testify at the ensuing trial as to his conduct of the investigation, and to express "certain factual conclusions," although the agent "never expressed an opinion as to whether Duncan was guilty of the offenses charged." 42 F.3d at 102. The court of appeals approved the receipt into evidence of those limited conclusions, reasoning that "[e]xpert witnesses are often uniquely qualified in guiding the trier of the fact through a complicated morass of obscure terms and concepts." *Id.* at 101. In holding the IRS agent's opinions admissible, the Second Circuit distinguished its prior opinion in *United States v. Scop*, 846 F.2d 135, *modified*, 856 F.2d 5 (2d Cir.1988), a securities fraud case where the court of appeals found reversible error in the trial court's permitting an SEC investigator with no personal knowledge of the facts to characterize the defendant's conduct as fraudulent in language that tracked the governing statute. The *Duncan* court, distinguishing *Scop*, said:

> The *Scop* court found the SEC investigator's testimony particularly objectionable because his stated conclusions were based not on personal knowledge, but on his assessment of the testimony and credibility of other witnesses. Therein, we found that the investigator encroached upon the exclusive province of the jury in weighing witness veracity.

42 F.3d at 101. That analysis resonates in the case at bar, because Professor Miller has no personal knowledge of the facts giving rise to Kidder's suit against IAG, and the resolution of the issues underlying IAG's claim of malicious prosecution will largely depend upon the jury's weighing of witness veracity.

The *Duncan* court also distinguished *Hygh v. Jacobs*, 961 F.2d 359 (2d Cir.1992), a civil rights action in which the plaintiff alleged use of excessive force by the police during his arrest. Plaintiff called one Professor Cox as "an expert witness concerning law enforcement." 961 F.2d at 361. The trial judge permitted Cox to express the opinions that the defendant arresting officer's conduct was not "justified under the circumstances," not "warranted under the circumstances," and "totally improper."

The Second Circuit held in *Hygh* that the admission of such opinions constituted error. After stating that "[t]his circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion," 961 F.2d at 363 (citations omitted), and invoking "the advisory committee's illuminating distinction between admissible and excludable versions of an expert's opinion testimony" following Rule 704(b), *id.*, the court of appeals said:

> Far more troubling, Cox testified that Jacobs' conduct was "not justified under the circumstances," not "warranted under the circumstances," and "totally improper." We have held that an expert's testimony that a defendant was "negligent" should not have been allowed. *See Andrews*, 882 F.2d at 709; *see also Strong*, 667 F.2d at 686 (question whether lack of warnings rendered product unreasonably dangerous for jury, not expert). We see no significant distinction in Cox's conclusory condemnations of Jacobs' actions here, which, in the language of the advisory committee,

"merely [told] the jury what result to reach." Fed.R.Evid. 704 advisory committee's note.

*Id.* at 364. The *Hygh* court concluded that "Cox's testimony regarding the ultimate legal conclusion entrusted to the jury crossed the line and should have been excluded." *Id.*[7] In *Duncan,* the Second Circuit said of *Hygh:*

> The ultimate issue before the jury was whether the defendant used excessive force. In holding that the expert's testimony was impermissible, this Court found that the witness went beyond simply making factual conclusions and instead asserted "conclusory condemnations ... [which] merely told the jury what result to reach."

42 F.3d at 102.

In the portion of the *Hygh* opinion quoted *supra,* the Second Circuit relied upon its prior holding in *Andrews v. Metro North Commuter Railroad Co.,* 882 F.2d 705 (2d Cir.1989), and an Eighth Circuit decision, *Strong v. E.I. DuPont de Nemours Co., Inc.*, 667 F.2d 682 (8th Cir.1981). The plaintiff in *Andrews* alleged that he slipped off a railroad platform and was injured by a moving train after he had walked some 3,000 feet along the tracks. The trial judge permitted plaintiff's expert witness to testify that it was "reasonable" for plaintiff to have walked that distance on the tracks, and that "the railroad was negligent" in failing to avoid him. 882 F.2d at 708–09. The Second Circuit held that by admitting those opinions, the trial judge permitted the expert "to exceed consistently the legitimate boundaries" of Rule 702, which preclude expert opinion testimony with respect to "lay matters which a jury is capable of understanding and deciding without the expert's help." *Id.* at 708.

*Strong* arose out of a building explosion which killed plaintiff's decedent. Plaintiff's theory was that a "pull-out" of a plastic pipe from a coupling caused gas to seep into the basement. Plaintiff called as an expert witness an engineer who had investigated the explosion. He offered to testify that "the

lack of adequate warnings and instructions constituted defects which made the products unreasonably dangerous." 667 F.2d at 685. The trial judge excluded that testimony under Rule 704, reasoning that this answer to the underlying question—"Is this an adequate warning?"—impermissibly invaded the province of the jury. *Id.* at 686. The Eighth Circuit affirmed on that basis and added:

> In addition to these considerations, we note that the question of whether the lack of warnings rendered the DuPont and Norton McMurray products unreasonably dangerous is not the kind of issue on which expert assistance is essential for the trier of fact. The jury was capable of drawing its own inferences from the available evidence.

*Id.*

In *United States v. Russo,* 74 F.3d 1383 (2d Cir.1996), a prosecution for stock manipulation, the Second Circuit affirmed the trial court's admission of a government expert's testimony because "it focused solely on factual considerations and did not involve any legal characterizations. [The expert] gave no opinion as to whether the appellants had violated the securities laws and did not make any statements about their intent; he simply described certain stock transactions and his opinion of their effect on the market." 74 F.3d at 1395. *Russo* cited *United States v. Bilzerian,* 926 F.2d 1285 (2d Cir.1991), another securities fraud case where the government offered and the trial judge admitted comparably limited expert testimony. The Second Circuit affirmed, noting that "[p]articularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts," but cautioned that the use of such testimony "must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying the law to the facts before it." 926 F.2d at 1294. The *Bilzerian* court continued:

---

**7.** The *Hygh* court also concluded that "the erroneous admission of Cox's impermissibly conclusory testimony," 961 F.2d at 365, did not call for a new trial because there was "a larger body of otherwise unobjectionable testimony" from which the jury "could easily have drawn the same conclusions that Cox did." *Id.* The fact that the trial court's error was regarded as harmless does not affect the court of appeals' analysis of that error.

Although testimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice, *Marx*, 550 F.2d at 509, testimony encompassing an ultimate legal conclusion based on the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice.

*Id.* at 1295.

*United States v. Bronston,* 658 F.2d 920 (2d Cir.1981), was the prosecution of a partner of a law firm for mail fraud arising out of the partner's "duty of loyalty to his firm's clients" and "his concealment from the clients of his promotion to their harm" of the interests of a rival company. *Id.* at 922. The accused partner, Bronston, did not testify at the trial. The defense called another partner, one Freund, and sought to elicit from him expert testimony "regarding the ultimate question of whether Bronston's conduct amounted to a breach of fiduciary," *id.* at 930. The trial judge excluded that testimony. The Second Circuit affirmed, characterizing Freund's opinion as "clearly inadmissible" because, *inter alia*, "his testimony would in substance have conveyed nothing more to the jury than his 'general belief as to how the case should be decided.'" *Id.* (citing and quoting *Marx & Co. v. Diners' Club, Inc.,* 550 F.2d 505, 510 (2d Cir.)).

The *Marx* case, cited by the Second Circuit in several of its subsequent decisions, is instructive in the case at bar because it involved a claim for breach of contract. Plaintiff Fugazy Travel sold its assets to defendant Diners Club in return for unregistered stock in the latter company. Fugazy alleged that Diners had breached the contract of sale by breaking its promise to use its best efforts to effect a registration of those shares when requested by Fugazy to do so. That breach of contract claim was submitted to the jury, which decided in plaintiff's favor.[8] The Second Circuit identified the issues of fact for the jury to decide as "whether Diners had filed a registration statement promptly upon

request and whether it had used its best efforts to make it effective," 550 F.2d at 508, or in other words, "whether Diners' conduct was reasonable in the circumstances in which it found itself," *id.* at 511.

The court of appeals reversed the judgment for Fugazy on its contract claim, entered on the jury verdict, and remanded for a new trial, because the trial judge had impermissibly allowed plaintiff's expert witness, one Friedman, a lawyer versed in securities regulation, "to give his opinion as to the legal obligations of the parties under the contract." 550 F.2d at 508. While the expert could properly have described the customary practices of the securities business, he crossed into forbidden territory when he testified "as to what was necessary to fulfill the covenant [of the contract]," testimony which "did not concern practices in the securities business, on which Mr. Friedman was qualified as an expert, but were rather legal opinions as to the meaning of the contract terms at issue." *Id.* at 509. This testimony violated Rule 702, because "[i]t is not for a witness to instruct the jury as to applicable principles of law, but for the judge." *Id.* at 508–10. Moreover, "[n]ot only did Friedman construe the contract, but he also repeatedly gave his conclusions as to the legal significance of various facts adduced at trial," conclusions that were "based merely on his examination of documents and correspondence, which were equally before the judge and jury," and consequently not admissible, since "[t]he admission of such testimony would give the appearance that the court was shifting to witnesses the responsibility to decide the case. It is for the jury to evaluate the facts in the light of the applicable rules of law, and it is therefore erroneous for a witness to state his opinion on the law of the forum." *Id.* at 510 (citation omitted). In *Marx* the Second Circuit cautions trial judges "not to allow trials before juries to become battles of paid advocates posing as experts on the respective sides concerning matters of domestic law." *Id.* at 511. That cautionary note resonates in the case at bar,

---

8. Fugazy also asserted a claim for securities fraud which the district dismissed, for reasons

not germane to the present analysis.

because any opinion Professor Miller is allowed to give for Kidder will inevitably be countered by a contrary opinion by IAG's expert witness, be that witness Judge Adams or someone else.

To the same effect is *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250 (2d Cir.1987), in which an administrative services company sued benefits funds trustees for breaching a contract whereby plaintiff would render services to the funds for a term of years. The case was tried to a jury. The defendant trustees proposed to ask an attorney, one Raysman, "to testify, as an expert witness, that the Contracts were unenforceable because they lacked essential terms." 810 F.2d at 1256. The Second Circuit affirming the district court's exclusion of that testimony, said that "the district court did not err in excluding Raysman's proposed testimony that the Contracts were unenforceable for lack of essential terms." 810 F.2d at 1258, citing and quoting *Marx* at 550 F.2d at 509–10 ("It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge.").

The Second Circuit has made it plain that it strictly enforces the limitations placed by the rules of evidence upon expert opinion testimony, even if a different result would have obtained in other circuits. Thus in *United States v. Ingredient Technology, Inc.*, 698 F.2d 88, 97 (2d Cir.1983), a prosecution for tax fraud based upon inventory overstatements, the Second Circuit affirmed the trial court's exclusion of a defense expert's testimony about Treasury regulations, offered to show that defendants could not have formed the requisite willful intent to evade taxes. The court of appeals held that whether or not corporate income was taxable was a question of law for the court, and the issue of defendant's willfulness one of fact for the jury. 698 F.2d at 96–97. In *Ingredient Technology* the Second Circuit specifically declined to follow the Fifth Circuit's decision in *United States v. Garber*, 607 F.2d 92 (5th Cir.1979) (en banc), reversing a conviction because the trial court excluded a defense expert's opinion that income was not taxable. The Second Circuit said:

We agree with the *Garber* dissent, 607 F.2d at 105, that it would be very confusing for a jury to have opposing opinions of law admitted into evidence as involving a factual question for them to decide. Indeed, as that dissent points out, the inevitable logic of the majority's decision is that if the tax law is uncertain, the indictment should be dismissed. Questions of law are for the court [citing the Second Circuit's opinions in *Bronston* and *Marx*]. To the extent that *Garber* is inconsistent with our *Bronston* and *Marx* cases, we decline to follow it.

698 F.2d at 97. The Second Circuit added: "The court's instructions were proper concerning willfulness, an issue which is a question of fact for the jury." *Id.*

A core issue in the case at bar is whether Kidder reasonably relied upon the advice of M & W, thereby negating an inference that Kidder acted maliciously. The Second Circuit does not appear to have considered the admissibility of expert testimony in the context of a party's reliance on counsel. But two cases from other circuits are instructive. *See United States v. Klaphake*, 64 F.3d 435 (8th Cir.1995); *United States v. West*, 22 F.3d 586 (5th Cir.1994).

*Klaphake* was a prosecution for tax evasion which turned upon the legality of a business trust arrangement entered into by defendant. At trial defendant called an attorney, one Koch, who advised him on the arrangement. The trial judge permitted that attorney to testify regarding matters within his personal knowledge, including the legitimate purposes and advantages of business trusts, and even to identify his written opinion that the trusts in question were legitimate, which the court received in evidence. But the trial judge precluded the attorney from testifying to the jury regarding the legality of defendant's business trust. The Eighth Circuit affirmed:

It was not proper for Koch to testify concerning the legality of the trust agreement. As a general rule, questions of law are the subject of the court's instructions and not the subject of expert testimony (citations omitted). We do not agree with Klaphake that the district court's ruling completely eviscerated his reasonable-reliance de-

fense. The district court did not totally exclude Koch's testimony, but rather limited his testimony to matters within his personal knowledge.

64 F.3d at 439.[9] One of the cases the Eighth Circuit cited was the Second Circuit's opinion in *Ingredient Technology*, discussed *supra*.

*West* was a prosecution for bankruptcy fraud and money laundering. Defendant argued on appeal that his trial was unfair "because the district court refused to allow two bankruptcy experts—Philip Palmer and William H. Brister—to testify regarding the relationship between the Texas Homestead Act and federal bankruptcy law." 22 F.3d at 598 (footnote omitted). The Fifth Circuit continued:

> West contends that such testimony would have demonstrated that he at all times acted in good faith, and thus was relevant to the issue of his intent. Here, West's good faith defense was centered upon his asserted reliance on the advice of his bankruptcy counsel—Philip Palmer—and his accountant—Nathan Reeder. Although both Palmer and Reeder testified they advised West to structure the Dondi Farms, Broadway building, and Frisco house transactions as he did and that the transactions were lawful, West contends that the district court erred in not allowing him to demonstrate "that it was reasonable to follow [the advice supplied Palmer and Reeder]—a showing that of necessity would include some explanation of … what a Texas homestead exemption was, and how one could lawfully preserve it, under bankruptcy law.

*Id.* (footnotes omitted).

The court of appeals rejected that argument:

Here, the critical issue at trial was whether West acted in good faith and relied upon the advice of counsel. Thus, the district court correctly allowed West to testify that he at all times relied in good faith upon the advice of experts and both Palmer and Reeder to testify that they advised West to structure the transactions as he did…. Consequently, West's defense—that he in good faith relied on the advice of counsel—was squarely placed before the jury. Because the typical juror is qualified to determine intelligently and to the best degree possible both the reasonableness of a client relying upon the advice of an attorney and accountant retained to render such advice and whether the client did so in good faith after making full disclosure, expert testimony as to the legal basis underlying the advice—i.e., the reasonableness of their interpretation of the provisions of the Texas Homestead Act—would not have assisted the jury.

*Id.* (footnotes omitted).

*Klaphake* and *West* stand for the propositions that while a client such as Kidder, asserting a reasonable reliance defense, may testify as to the disclosures it made to advisers, the advice it received and its reliance upon it, and the advisers may describe the advice they gave, questions of whether the client made full disclosure, and acted throughout in good faith or with malice, are for the jury to decide; and the jury is not assisted by expert opinion testimony about the reasonableness of the advice or the client's reaction to it.[10]

In contending that Professor Miller's opinions are not only admissible but essential to

---

9. Professor Miller cannot be analogized to Koch, the attorney who testified in *Klaphake*, because he played no part in the underlying events and has no personal knowledge of them. In the case at bar, the attorneys standing in the same shoes as Koch are the M & W attorneys who advised Kidder in the IAG litigation. They may testify on matters within their personal knowledge, as did attorney Koch in *Klaphake*.

10. The jury's function in evaluating a reliance on counsel defense is further explicated in Leonard B. Sand et al., *Modern Federal Jury Instructions* ¶ 8.04 (1995). The recommended instruction says in part:

> [Y]ou must ask yourselves whether the defendant honestly and in good faith sought the advice of a lawyer as to what he may lawfully do; whether he fully and honestly laid all the facts before his lawyer; and whether in good faith he honestly followed such advice, relying upon it and believing it to be correct…. Whether the defendant acted in good faith for the purpose of seeking guidance as to the specific acts in this case, and whether he acted substantially in accordance with the advice received, are questions for you to determine.

*Sand* omits any reference to whether the attorney's advice was correct in law, since that ques-

it, Kidder cites legal malpractice cases such as *Estate of Ginor v. Landsberg,* 960 F.Supp. 661 (S.D.N.Y.1996). But the instant case is not one for legal malpractice, and the analogy is false. A malpractice plaintiff must prove that the defendant failed to act in conformity with accepted professional standards prevailing at the place and time the services were rendered. Under New York law, a medical malpractice plaintiff cannot get his case to the jury in the absence of expert opinion testimony that the defendant violated those professional standards, *see Sitts v. United States,* 811 F.2d 736, 739–41 (2d Cir.1987) (issues presented by medical malpractice action would "quite obviously not [be] . . . within the realm of competence of a lay jury") (*construing* New York law); *McDermott v. Manhattan Eye, Ear & Throat Hosp.,* 15 N.Y.2d 20, 255 N.Y.S.2d 65, 68, 203 N.E.2d 469 (Ct.App.1960). I reached the same conclusion in a legal malpractice case, *Barry v. Liddle, O'Connor, Finkelstein & Robinson,* 1997 W.L. 7363725, 1997 U.S. Dist. LEXIS 18820 (S.D.N.Y.). However, in the case at bar, IAG is not suing either Kidder or M & W for legal malpractice. IAG is not suing M & W at all. IAG is suing Kidder for malicious prosecution; the case will turn upon the reasonableness of Kidder's conduct and its then-existing state of mind; and these are the sort of questions that lay jurors have been answering without expert assistance from time immemorial.

## VI.

I conclude that Second Circuit authority requires me to preclude Professor' Miller's opinion testimony, as set forth in his written report. The detailed reasoning contained in that report makes it unnecessary to defer this conclusion until his deposition has been taken or the trial has begun.

To the extent that Professor Miller would seek to opine before the jury that Kidder had probable cause to believe IAG breached its contract with Kidder, he would inevitably have to discuss his construction of the contract and the parties' obligations thereunder—as he does at length in the subparagraphs to his written report. But that testimony would usurp the role of the jury, and is precluded by the *Marx* and *Krear* decisions.[11]

To the extent that Professor Miller would seek to opine before the jury about the elements of New York contract and attachment law—as he does at length in the sub-paragraphs to his written report—his testimony would usurp the role of the trial judge in instructing the jury on the law.

To the extent that Professor Miller would seek to opine before the jury that Kidder acted reasonably and in good faith—as he argues at length in his written report—the overwhelming weight of Second Circuit authority precludes expert testimony about these issues. Whether a party acted with objective reasonableness is a quintessential common law jury question. By the same token, juries traditionally decide whether an individual acted knowingly, or willfully, or maliciously, or with specific intent, or with any other relevant state of mind. Thus, this case will present to the jury no new or more demanding task than what juries have always done.[12]

Kidder cites cases from other circuits which arguably support their contentions of admissibility. But as the cases reviewed in Part V demonstrate, the Second Circuit applies strict standards to the admissibility of expert opinions, disagreeing with other circuits when necessary, as *Ingredient Technology* illustrates. In the light of that line of

tion is not relevant to the considerations underlying the reliance on counsel defense.

11. *Marx* and *Krear* involved suits for breach of contract. Had the case at bar gone to trial on Kidder's breach of contract theory, there is no doubt that these cases would have precluded Professor Miller's opinions on contract issues. The Court would have instructed the jury on the law of contract, and the jury would have decided if there was a breach. On the question of admissibility of Professor Miller's opinions, no principled reason exists for reaching a different result

where the issue is the existence *vel non* of probable cause for Kidder to believe that IAG had breached the contract, in the procedural context of IAG's suit for malicious prosecution.

12. Professor Miller also opines at length that M & W's handling of the case was professionally proper, and that the firm arrived at correct legal conclusions. Those opinions are not relevant to the determinative issues of Kidder's conduct, and are in any event precluded by the analysis of *United States v. West, supra.*

authority, I believe that the Second Circuit would agree with the Eighth Circuit in *Klaphake* and the Fifth Circuit in *West,* were it to consider a case squarely presenting the reasonable-reliance defense, as those cases did, and whose reasoning would preclude the testimony that Kidder wants Professor Miller to give to the jury.

Believing that to be so, and given the Second Circuit cases cited *supra,* I grant IAG's motion to preclude Professor Miller's opinion testimony.

Notwithstanding Kidder's protests, this result works no unfairness upon it. The Kidder and M & W witnesses will testify fully concerning the relevant facts, as indeed they should. The Court will instruct the jury on the laws of contract, attachment, and malicious prosecution, as indeed it should. The jurors will then apply that law to the facts as they find them, as indeed they should, in fulfillment of the Nation's legal traditions.

This conclusion moots the necessity of Kidder's moving to disqualify Judge Adams as IAG's expert, a question which was not fully briefed to this Court, and upon which I express no opinion.

A separate scheduling order is being entered concurrently with this opinion.

It is SO ORDERED.